# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| STATE DEPARTMENT EMPLOYEE 1, and MANAGEMENT AND PROGRAM ANALYST, Citizenship and Immigration Services, Department of Homeland Security, for themselves and all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security, KIRAN AHUJA, in her official capacity as Director of the United States Office of Personnel Management, and LESLEY A. FIELD, in her official capacity as Acting Administrator for Federal Procurement Policy, Office of Management and Budget, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

No. 8:22-cv-00364 SDM-TGW

## SECOND AMENDED
## VERIFIED CLASS ACTION COMPLAINT
## FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
## DECLARATORY RELIEF, AND DAMAGES

For their VERIFIED CLASS ACTION COMPLAINT against Defendants,

ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department

of Homeland Security, KIRAN AHUJA, in her official capacity as Director of the

United States Office of Personnel Management, and LESLEY A. FIELD, in her

official capacity as Acting Administrator for Federal Procurement, Office of

Management and Budget, Plaintiffs, STATE DEPARTMENT EMPLOYEE 1 and

MANAGEMENT AND PROGRAM ANALYST, Citizenship and Immigration

Services, Department of Homeland Security, for themselves and all others similarly situated, allege and aver as follows:

## URGENCIES JUSTIFYING EXPEDITED RELIEF

1. Plaintiffs are civilian federal employees who are required by the Federal COVID-19 Vaccine Mandate to receive a COVID-19 vaccine that violates their sincerely held religious beliefs, and have been refused any religious exemption or accommodation. Civilian federal employees and contractors had until November 22, 2021, to become fully vaccinated, which date has passed. Relief is needed now to prevent these civilian federal employees from facing termination or other disciplinary action.

2. As the Supreme Court held barely a year ago, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). When the great American experiment was commenced, our Founders ordained and established the Constitution—including all of the rights it recognized and enshrined—"in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity." U.S. Const. Pmbl. To this very day, "we continue to strive toward '[that] more perfect union.'" *Smith v. City of New Smyrna Beach*, No. 6:11–cv–1110–Orl–37KRS, 2013 WL 5230659, at *1 (M.D. Fla. Sept. 16, 2013). That work is not easy,

and sometimes it requires the intervention of the judiciary to set the guardrails for the protection of the Republic's liberties.

3.      Recognizing that times of crisis would arise, that such times might lead governments to seek to repress precious freedoms, and that the Republic's survival depended upon defeating such repressive instincts, the genius of our founding document is that it placed explicit protections into the text of the Bill of Rights. And, importantly, "[o]ur Bill of Rights placed our survival on firmer ground—that of freedom, not repression." *Konigsberg v. State Bar of California*, 366 U.S. 36, 79 (1961) (Black, J., dissenting).

4.      During times of national crisis, "the fog of public excitement obscures the ancient landmarks set up in our Bill of Rights." *American Communist Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 453 (1950) (Black, J., dissenting). But, where the fog of public excitement is at its apex, "the more imperative is the need to preserve inviolate the constitutional rights of [the First Amendment]." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). Without doubt, "[t]herein lies the security of the Republic, the very foundation of constitutional government." *Id.*

5.      Indeed, "[t]imes of crisis take the truest measure of our commitment to constitutional values. Constitutional values are only as strong as our willingness to reaffirm them when they seem most costly to bear." *Hartness v. Bush*, 919 F.2d 170, 181 (D.C. Cir. 1990) (Edwards, J., dissenting). Our willingness to reaffirm our staunch commitment to our fundamental freedoms is imperative to the very survival of the

American experiment. "History reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring). For, "[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting).

6.     Defendants' vaccine mandate, ostensibly responding to a public health crisis, has created a national emergency of much greater magnitude. The mandate attacks not only the United States Armed Forces by removing brave servicemembers from defending the Nation by land, air, and sea, but also support for the military and other national interests by eliminating the dedicated civilian employees and contractors providing everything from boots and uniforms, to cyber security, to the world's most advanced stealth fighter jet—the F-35 Lightning II—solely because these protectors of our constitutional freedoms requested accommodation of their sincerely held religious beliefs under the same Constitution. The crisis created by Defendants' mandates, applied to two million federal employees, is unnecessary and completely avoidable, but nonetheless imminent and real.

7.     An injunction is needed now to prevent the immediate and irreparable injury to Plaintiffs imposed by these unlawful COVID-19 mandates.

## PARTIES

8.     Plaintiff STATE DEPARTMENT EMPLOYEE 1 is a civilian federal employee who has worked for the United States Department of State for six years. He is a federal law enforcement officer and tenured member of the Foreign Service. He has served in multiple domestic and overseas assignments, including high-threat posts around the world, where he has protected American diplomats, politicians, aid workers, and citizens as well as foreign nationals, during periods of unrest and instability. Over the past two years, he has served in multiple "COVID hot spots" around the world without incident, despite never having received a COVID injection. However, he has faced repeated demands to accept a COVID-19 injection and has been informed there will be adverse disciplinary actions and career repercussions up to and including termination of employment if he refuses to do so. He has been working remotely for the last ten months. He has sincerely held religious beliefs that compel him to abstain from accepting or receiving a COVID-19 injection because he believes doing so would be a transgression of the stewardship he has over his body and a clear violation of God's will as revealed through Scripture and the Holy Spirit. He has requested a religious exemption and accommodation but has not been given a response to his request other than repeated harassing emails from the State Department and discriminatory adverse employment action in the form of two Letters of Counseling threatening termination of his employment for failure to provide proof of "full vaccination" for COVID-19.

9.     Plaintiff MANAGEMENT AND PROGRAM ANALYST is a civilian federal employee with the United States Citizenship and Immigration Services, Department of Homeland Security. He has faithfully served for approximately 24 years of creditable service in the federal government. He received a broadcast email that states if he is denied reasonable accommodation, he will have 14 days to either receive a single shot vaccine or the first of a two-shot vaccine with the second shot due within six weeks. He received a broadcast email describing the various consequences of non-compliance, including formal discipline, such as a letter of reprimand or suspension proposal, with the last step being removal from federal service. MANAGEMENT AND PROGRAM ANALYST has a sincerely held religious objection to receiving any vaccine using aborted fetal cells in their development or testing, and to the loss of his free will to preserve his body as the temple of the Holy Spirit as best as he can. MANAGEMENT AND PROGRAM ANALYST has requested a religious accommodation which has not been granted.

10.     Defendant ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security, is responsible for enacting, implementing, and enforcing the Federal COVID-19 Vaccine Mandate for members of the United States Coast Guard and other civilian federal employees and contractors. Secretary Mayorkas is sued in his official capacity.

11.     Defendant KIRAN AHUJA, in her official capacity as Director of the United States Office of Personnel Management, is responsible for overseeing human

resources for all employees of the United States government and is tasked with enforcing and administering Federal COVID-19 Vaccine Mandate for all federal employees. Defendant Ahuja is sued in her official capacity.

12.     Defendant LESLEY A. FIELD, in her official capacity as Acting Administrator for Federal Procurement Policy, Office of Management and Budget, is tasked with enforcing and administering the Federal COVID-19 Vaccine Mandate for all civilian federal employees and contractors. Defendant Field is sued in her official capacity.

## JURISDICTION

13.     This action arises under the First Amendment to the United States Constitution. This action also arises under federal statutory law, namely the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4, the Emergency Use Authorization provisions of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 360bbb-3, and the Administrative Procedure Act, 5 U.S.C. § 706.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the action as originally filed in Case No. 8:21-cv-02429 SDM-TGW occurred in this district, and venue remains proper because this action was severed from the original action by the Court's Order (Doc. 89) and agreement of the parties.

16.     This Court has the authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure, and the requested injunctive relief under 28 U.S.C. § 2202 and Rule 65, Federal Rules of Civil Procedure.

17.     This Court has the authority to award the requested costs and attorney's fees under 28 U.S.C. §§ 1920 and 2412 and 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

### A.     THE FEDERAL COVID-19 VACCINE MANDATE.

18.     On September 9, 2021, President Biden issued Executive Order 14043, Requiring Coronavirus Disease 2019 Vaccination for Federal Employees, requiring all federal employees to receive one of the COVID-19 vaccines as a condition of employment. (A true and correct copy of Executive Order 14043 is attached hereto as **EXHIBIT A** and incorporated herein.)

19.     In Executive Order 14043, President Biden stated: "I have determined that to promote the health and safety of the Federal workforce and the efficiency of the civil service, it is necessary to require COVID-19 vaccination for all Federal employees . . . ." (Ex. A at 2.)

20.     Consistent with that determination, Executive Order 14043 states: "Each agency shall implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees . . . ." (Ex. A at 2.)

21.     Also on September 9, 2021, President Biden issued Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, requiring that all federal contractors and subcontractors "comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force." (A true and correct copy of Executive Order 14042 is attached hereto as **EXHIBIT B** and incorporated herein.) Pursuant to Executive Order 14042, the Safer Federal Workforce Task Force issued its *Guidance for Federal Contractors and Subcontractors* on September 24, 2021, requiring that all employees of federal contractors and subcontractors receive one of the COVID-19 vaccines as a condition of performing any contract for work for the Federal Government. (A true and correct copy of the *Guidance* is attached hereto as **EXHIBIT C** and incorporated herein.)

22.     President Biden's Executive Orders and all related, resulting, subsequent, amended, or superseding federal orders or directives mandating the vaccination of all civilian federal employees are sometimes collectively referred to herein as the "Federal COVID-19 Vaccine Mandate."

**B.     PLAINTIFFS' SINCERELY HELD RELIGIOUS BELIEFS.**

23.     Plaintiffs all have sincerely held religious beliefs, rooted in Scripture, that preclude them from complying with the Federal COVID-19 Vaccine Mandate because of the connections between the various COVID-19 vaccines and the cell lines of aborted fetuses, whether in the vaccines' origination, production, development, testing, or other inputs. Plaintiffs also have sincerely held religious beliefs, rooted in

Scripture, that their bodies are temples of the Holy Spirit and that they cannot place anything into their Temples without confirmation and conviction from the Holy Spirit.

24.     A fundamental component of Plaintiffs' sincerely held religious beliefs is that all life is sacred, from the moment of conception to natural death, and that abortion is the murder of an innocent life and a grave sin against God.

25.     Plaintiffs' sincerely held religious beliefs are rooted in Scripture's teachings that "[a]ll Scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, [and] for instruction in righteousness." *2 Timothy* 3:16 (KJV).

26.     Because of that sincerely held religious belief, Plaintiffs believe that they must conform their lives, including their decisions relating to medical care, to the commands and teaching of Scripture.

27.     Plaintiffs have sincerely held religious beliefs that God forms children in the womb and knows them prior to birth, and that because of this, life is sacred from the moment of conception to natural death. *See Psalm* 139:13–14 (ESV) ("For you formed my inward parts; you knitted me together in my mother's womb. I praise you, for I am fearfully and wonderfully made."); *Psalm* 139:16 (ESV) ("Your eyes saw my unformed substance; in your book were written, every one of them, the days that were formed for me, when as yet there was none of them."); *Isaiah* 44:2 (ESV) ("Thus says the LORD who made you, who formed you from the womb . . . ."); *Isaiah* 44:24 (ESV) ("Thus says the LORD, your Redeemer, who formed you from the womb: 'I am the

Lord, who made all things . . . .'"); *Isaiah* 49:1b (ESV) ("The LORD called me from the womb, from the body of my mother he named my name."); *Isaiah* 49:5 (ESV) ("And now the LORD says, he who formed me from the womb to be his servant . . . ."); *Jeremiah* 1:5 (ESV) ("'Before I formed you in the womb I knew you, and before you were born I consecrated you; I appointed you a prophet to the nations.'").

28.     Plaintiffs also have sincerely held religious beliefs that every child's life is sacred because each is made in the image of God. *See Genesis* 1:26–27 (ESV) ("Then God said, 'Let us make man in our image, after our likeness. . . . So God created man in his own image, in the image of God he created him; male and female he created them.'" (footnote omitted)).

29.     Plaintiffs have sincerely held religious beliefs that because life is sacred from the moment of conception, the killing of that innocent life is the murder of an innocent human in violation of Scripture. *See, e.g.*, *Exodus* 20:13 (ESV) ("'You shall not murder.'"); *Exodus* 21:22–23 (ESV) (imposing death penalty for killing of an unborn child); *Exodus* 23:7 (ESV) ("'[D]o not kill the innocent and righteous . . . .'"); *Genesis* 9:6 (ESV) ("'Whoever sheds the blood of man, by man shall his blood be shed, for God made man in his own image.'"); *Deuteronomy* 27:25 (ESV) ("Cursed be anyone who takes a bribe to shed innocent blood." (internal quotation marks omitted)); *Proverbs* 6:16–17 (ESV) ("There are six things that the LORD hates, seven that are an abomination to him: . . . hands that shed innocent blood . . . .").

30.     The Hebrew word for "abomination" in the text above is תּוֹעֵבָה (to`eba). The verbal form is "abhor," "loath," "detest," and "exclude." Twelve times the Book of Proverbs uses תּוֹעֵבָה in reference to an "abomination to the LORD." (יהוה or Yahweh). The word is also used in conjunction with the Ammonites and the Ashtoreth, the Sidonians, Chemosth, and Moab. Some of these nations sacrificed their children to Baal. Indeed, *Jeremiah* 19:4–9, refers to the shedding of innocent blood by sacrificing children as the reason for judgement against Judah. Abortion is the modern-day sacrifice of children made in the image of God. Plaintiffs do not want to be part of such an "abomination." They do not want indirectly or directly to be in any way associated with abortion. To do so is abhorrent, loathsome, detestable, abominable to God. In short, to require these employees to inject a substance into their bodies that has any association (no matter how near or remote to abortion) is a sin against their Creator, their Lord, and their Savior.

31.     Plaintiffs also have sincerely held religious beliefs that it would be better to tie millstones around their necks and be drowned in the sea than to bring harm to an innocent child. *See Matthew* 18:6; *Luke* 17:2 (ESV).

32.     Plaintiffs also have sincerely held religious beliefs that their bodies are temples of the Holy Spirit, and that to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the temple of the Holy Spirit. (*See 1 Corinthians* 6:15–20 (ESV) ("Do you not know that your bodies are members of Christ? . . . Or do you not know that your body is a temple of the Holy

Spirit within you, whom you have from God? You are not your own, for you were bought with a price. So glorify God in your body.").

33.    Plaintiffs' religious beliefs compel them to not condone, support, justify, or benefit (directly or indirectly) from the taking of innocent human life via abortion, and that to do so is sinning against God.

34.    Plaintiffs' sincerely held religious beliefs preclude them from accepting any one of the three currently available COVID-19 vaccines derived from, produced or manufactured by, tested on, developed with, or otherwise connected to aborted fetal cell lines.

35.    As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by Johnson & Johnson **did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine**." *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20P age/COVID-19_Vaccine_Fetal_Cell_Handout.pdf.

36.    The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was **isolated from a terminated fetus in 1985**." La. Dep't of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020),

https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/
You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (emphasis added).

37.     Scientists at the American Association for the Advancement of Science
have likewise published research showing that the Johnson & Johnson vaccine used
aborted fetal cell lines in the development and production phases of the vaccine.
Meredith Wadman, *Vaccines that use human fetal cells draw fire*, Science (June 12, 2020),
*available at* https://science.sciencemag.org/content/368/6496/1170.full.

38.     The same is true of the Moderna and Pfizer-BioNTech mRNA vaccines.
The Louisiana Department of Health's publications again confirm that aborted fetal
cells lines were used in the "proof of concept" phase of the development of their
mRNA vaccines. *See* La. Dep't of Public Health, *supra*.

39.     The North Dakota Department of Health likewise confirms: "Early in
the development of mRNA vaccine technology, **fetal cells were used for 'proof of
concept' (to demonstrate how a cell could take up mRNA and produce the SARS-
CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein**." N.D.
Health, *supra* (emphasis added).

40.     The Chief Scientific Officer and Senior Director of Worldwide Research
for Pfizer have also been reported to demonstrate that its COVID-19 vaccine is derived
from aborted fetal cells and have made statements that they wanted to keep that
information from the public. *See PFIZER LEAKS: Whistleblower Goes On Record, Reveals
Internal Emails from Chief Scientific Officer & Senior Director of Worldwide Research*

*Discussing COVID Vaccine ... 'We Want to Avoid Having the Information on the Fetal Cells Floating Out There'*, ProjectVeritas (Oct. 6, 2021), https://www.projectveritas.com/news/pfizer-leaks-whistleblower-goes-on-record-reveals-internal-emails-from-chief/.

41. Specifically, Vanessa Gelman, Pfizer Senior Director of Worldwide Research: "From the perspective of corporate affairs, we want to avoid having the information on fetal cells floating out there…The risk of communicating this right now outweighs any potential benefit we could see, particularly with general members of the public who may take this information and use it in ways we may not want out there. We have not received any questions from policy makers or media on this issue in the last few weeks, so we want to avoid raising this if possible." *Id.*

42. And Philip Dormitzer, Pfizer's Chief Scientific Officer, is reported as saying that he wanted to keep the information secret because of the objections that pro-life individuals, such as Plaintiffs in this action, would have: "HEK293T cells, used for the IVE assay, are ultimately derived from an aborted fetus. On the other hand, the Vatican doctrinal committee has confirmed that they consider it acceptable for Pro-Life believers to be immunized. Pfizer's official statement couches the answer well and is what should be provided in response to an outside inquiry." *Id.*

43. Because all three of the currently available COVID-19 vaccines are developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6, Plaintiffs' sincerely held religious

beliefs compel them to abstain from obtaining or injecting any of these products into their bodies, regardless of the perceived benefit or rationale.

44.     Plaintiffs have sincerely held religious beliefs that their bodies are temples of the Holy Spirit, and that to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the temple of the Holy Spirit.

45.     Plaintiffs' sincerely held religious beliefs that their bodies are temples of the Holy Spirit and that they are to glorify God with their bodies lays the foundation for everything they do, consume, or inject into their bodies. From this foundation they make studied and reasonable decisions about what is good and what is not good or may not be good for their bodies. To knowingly abuse their bodies by engaging in a dishonorable act, or consuming or injecting a substance that will or may produce adverse consequences, is a sin against God. Based on this foundation, Plaintiffs would consume pure water over a similarly clear liquid they know or reasonably conclude is harmful to the body. This belief and other sincerely held religious beliefs are foundational to all their decisions and actions and are not limited to aborted fetal cell lines.

46.     Plaintiffs have sincerely held religious beliefs that the Holy Spirit— through prayer and the revelation of Scripture—guide them in all decisions they make in life.

47.     Plaintiffs have sincerely held religious beliefs that Jesus Christ came to this earth, died on the cross for their sins, and was resurrected three days later, and

that when He ascended to Heaven, He sent the Holy Spirit to indwell His believers and to guide them in all aspects of their lives. *See John* 16:7 (ESV) ("Nevertheless, I tell you the truth: it is to your advantage that I go away, for if I do not go away, the Helper will not come to you. But if I go, I will send him to you."); *John* 14:26 (ESV) ("But the Helper, the Holy Spirit, whom the Father will send in my name, he will teach you all things and bring to your remembrance all that I have said to you.").

48.     Plaintiffs have sincerely held religious beliefs that the Holy Spirit was given to them by God to reprove them of righteousness and sin and to guide them into all truth. *See John* 16:8–13 (ESV) ("And when he comes, he will convict the world concerning sin and righteousness and judgment . . . . When the Spirit of truth comes, he will guide you into all the truth, for he will not speak on his own authority, but whatever he hears he will speak, and he will declare to you the things that are to come.").

49.     Plaintiffs also have sincerely held religious beliefs that they will receive answers to their questions through prayer and supplication, including for decisions governing their medical health. *See James* 1:5 (ESV) ("If any of you lacks wisdom, let him ask God, who gives generously to all without reproach, and it will be given him."); *Mark* 11:24 (ESV) ("Therefore I tell you, whatever you ask in prayer, believe that you have received it, and it will be yours."); *Philippians* 4:6–7 (ESV) ("[D]o not be anxious about anything, but in everything by prayer and supplication with thanksgiving let your requests be made known to God. And the peace of God, which surpasses all

understanding, will guard your hearts and your minds in Christ Jesus."); *1 John* 4:14–15 (ESV) ("And we have seen and testify that the Father has sent his Son to be the Savior of the world. Whoever confesses that Jesus is the Son of God, God abides in him, and he in God.").

50.     Through much prayer and reflection, Plaintiffs have sought wisdom, understanding, and guidance on the proper decisions to make concerning these COVID-19 vaccines, and Plaintiffs have been convicted by the Holy Spirit that accepting any of the three currently available vaccines is against the teachings of Scripture and would be a sin.

51.     Plaintiffs have sincerely held religious beliefs that compel them to follow the teachings of the Holy Spirit, who has not given them peace, comfort, or admonition to accept any of the three currently available COVID-19 vaccines.

52.     Plaintiffs have sincerely held religious beliefs that they are being guided and instructed by the Holy Spirit not to accept any of the three currently available COVID-19 vaccines and that it would be a sin against God to do so.

**C.     PLAINTIFFS' WILLINGNESS TO COMPLY WITH SAFE AND TESTED ALTERNATIVES TO UNIVERSAL VACCINATION AS ACCOMMODATION OF THEIR SINCERELY HELD RELIGIOUS BELIEFS.**

53.     Plaintiffs have offered, and are ready, willing, and able to comply with all reasonable health and safety requirements to facilitate their religious exemption and accommodation from the Federal COVID-19 Vaccine Mandate.

54.    Plaintiffs have all informed their respective supervisors that they are willing to comply with reasonable conditions that were sufficient for nearly two years, permitting them to fulfill their sworn duties and faithful service to their employers and a grateful nation, and which reasonable conditions continued from the FDA's Emergency Use Authorization (EUA) of the first COVID-19 vaccine in December 2020, until September 9 for civilian federal employees and contractors. Nothing has changed except for the Vaccine Mandate, and thus the past proves a good example of present and future reasonable accommodations.

55.    The accommodations which have been ongoing for two years are certainly reasonable under the accumulating scientific evidence. Indeed,

> A preliminary study has shown that in the case of a breakthrough infection, the Delta variant is able to grow in the noses of vaccinated people **to the same degree as if they were not vaccinated at all**. The virus that grows is just as infectious as that in unvaccinated people, meaning vaccinated people can transmit the virus and infect others.

Sanjay Mishra, *Evidence mounts that people with breakthrough infections can spread Delta easily*, National Geographic (Aug. 20, 2021), https://www.nationalgeographic.com/science/article/evidence-mounts-that-people-with-breakthrough-infections-can-spread-delta-easily (emphasis added); *see also Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR* (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (noting "**the Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people**" (emphasis added).)

19

56. The CDC Director also admitted that the currently available COVID-19 vaccines do not prevent transmission. *See* Tim Hains, *CDC Director: Vaccines No Longer Prevent You From Spreading COVID* (Aug. 6, 2021), https://www.realclearpolitics.com/video/2021/08/06/cdc_director_vaccines_no_longer_prevent_you_from_spreading_covid.html#!.

57. Other reasonable protocols beyond the currently available COVID vaccines remain sufficient to prevent the spread of COVID-19 among civilian federal employees and contractors, and constitute a reasonable alternative to mandatory, universal vaccination as an accommodation of sincerely held religious beliefs.

58. The United States District Court for the Western District of Louisiana recently issued a TRO against a medical school for the school's failure to grant religious exemptions when other reasonable accommodations were available and mandatory vaccination was not the least restrictive means of achieving the school's interest in protecting the school's student body. *See Magliulo v. Edward Via College of Osteopathic Medicine*, No. 3:21-CV-2304, 2021 WL 36799227 (W.D. La. Aug. 17, 2021).

59. The United States District Court for the Western District of Michigan issued a TRO against a university for its failure to allow students with religious objections to vaccination to participate in athletics and other extracurricular activities when other reasonable alternatives were available as a reasonable accommodation for their religious beliefs. *See Dahl v. Bd. of Trustees of W. Mich. Univ.*, No. 1:21-cv-757, 2021

WL 3891620, *2 (W.D. Mich. Aug. 31, 2021). The Sixth Circuit Court of Appeals affirmed that preliminary injunction in its order refusing to stay the preliminary injunction. *See Dahl v. Bd. of Trustees of W. Mich. Univ.*, No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021).

60.     In *U.S. Navy Seals v. Biden*, No. 4:21-cv-1236-O, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022), the United States District Court for the Northern District of Texas entered a preliminary injunction against the United States Navy's sham process for requesting and receiving a religious exemption and accommodation. Indeed, the Court there noted that "The Navy provides a religious accommodation process, but by all accounts, **it is theater**. The Navy has not granted a religious exemption to any vaccine in recent memory. **It merely rubber stamps each** denial." *Id.* at *1 (emphasis added).

61.     In *State v. Nelson*, No. 8:21-cv-2524-SDM-TGW, 2021 WL 6108948, *11 (M.D. Fla. Dec. 22, 2021) (Merryday, J.), this Court held that Defendants' COVID-19 vaccine mandate on federal contractors was also unlawful and issued a preliminary injunction. This Court held that the mandate was issued in excess of the statutory jurisdiction provided to Defendants.

62.     The Sixth Circuit, too, has held that the President and the agencies to whom he purportedly delegated authority for the vaccine mandate on federal contractors lacked authority to issue a mandate on federal contractors. *See Kentucky v. Biden*, No. 21-6147, 2022 WL 43178 (6th Cir. Jan. 5, 2022). Indeed, "if the President can order medical interventions in the name of reducing absenteeism, what is the

logical stopping point of that power?" *Id.* at *15. Defendants' vaccine mandate on federal contractors "**requires vaccination everywhere and all the time**. It is not 'anchored' to the statutory text, not is it even 'anchored' to the work of federal contractors." *Id.* (emphasis added). "We thus conclude that the federal government is unlikely to prevail on its argument that the Property Act authorizes imposition of the contractor mandate." *Id.* at 16.

63.    Several Plaintiffs and countless other class members were previously infected with COVID-19, have serologic test results demonstrating natural antibodies and immunity to COVID-19, and otherwise qualify for the exemptions ostensibly available for other federal employees. Plaintiffs, however, have been denied the ability to even request the officially available exemptions.

**D.    PLAINTIFFS' REQUESTS FOR AN ACCOMMODATION FROM THE MANDATORY COVID-19 VACCINE POLICY.**

64.    STATE DEPARTMENT EMPLOYEE 1 has sincerely held religious beliefs that compel him to abstain from accepting a COVID-19 injection because he believes doing so would be a transgression of the stewardship he has over his body and a clear violation of God's will, as revealed by Scripture and the Holy Spirit. He has been informed that he will receive adverse disciplinary actions and career repercussions up to and including termination if he refuses an injection. He has requested a religious exemption and accommodation but has received no response other than repeated harassing emails from the State Department and discriminatory adverse employment action in the form of two Letters of Counseling threatening

termination of his employment for failure to provide proof of "full vaccination" for COVID-19.

65.     MANAGEMENT AND PROGRAM ANALYST has requested a religious accommodation based on his sincerely held religious objection to receiving any vaccine using aborted fetal cells in their development or testing, and to the loss of his free will to preserve his body as the temple of the Holy Spirit as best as he can. MANAGEMENT AND PROGRAM ANALYST's request for accommodation has not been granted.

66.     While many class members' religious exemption requests have already been denied, the still pending requests have been effectively denied, as Plaintiffs and class members with pending requests have been threatened with discipline and termination for merely seeking accommodation of their sincerely held religious beliefs.

**E.     THE ONLY COVID-19 VACCINES AVAILABLE IN THE UNITED STATES ARE ADMINISTERED UNDER EMERGENCY USE AUTHORIZATION BECAUSE THERE IS NO FDA APPROVED COVID-19 VACCINE CURRENTLY AVAILABLE IN THE UNITED STATES.**

67.     Despite the misreporting, there is no COVID-19 vaccine available in the United States that has received full FDA licensing and approval.

68.     On August 23, 2021, the United States Food and Drug Administration issued two separate letters pertaining to two legally distinct COVID-19 vaccines—the Pfizer-BioNTech COVID-19 Vaccine (the "Pfizer-BioNTech Vaccine") and the newly

approved   BioNTech   COMIRNATY,   COVID-19   Vaccine,   mRNA ("COMIRNATY").

69.   The COMIRNATY letter announced the FDA's approval and licensure of COMIRNATY. (A true and correct copy of the COMIRNATY letter is attached hereto as **EXHIBIT D** and is available at https://www.fda.gov/media/151710/download (last visited Feb. 21, 2022).)

70.   The August 23, 2021 Pfizer-BioNTech Vaccine letter has been subsequently reissued on September 22, 2021, October 20, 2021, October 29, 2021, November 19, 2021, December 9, 2021, December 16, 2021, and January 3, 2021. (A true and correct copy of the January 3, 2021 Pfizer-BioNTech Vaccine letter is attached hereto as **EXHIBIT E** and is available at https://www.fda.gov/media/150386/download (last visited Feb. 21, 2022).)

71.   The January 3, 2021 Pfizer-BioNTech Vaccine letter announced the FDA's continuing Emergency Use Authorization (EUA) of the Pfizer-BioNTech Vaccine, having originally granted the EUA on December 11, 2020. The letter also recites that the EUA was continued several times in between, on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, August 12, 2021, August 23, 2021, September 22, 2021, October 20, 2021, October 29, 2021, November 19, 2021, December 9, 2021, and December 16, 2021. (Ex. E at 1–2.)

72.     The Pfizer-BioNTech Vaccine letter also makes clear that there are scientific, manufacturing, and **legal** differences between the EUA Pfizer-BioNTech Vaccine and the licensed COMIRNATY vaccine. (Ex. E at 12.)

73.     Specifically, the FDA stated that although COMIRNATY was granted full approval by the FDA, the Pfizer-BioNTech Vaccine was still only authorized under the EUA. (Ex. E at 2 n.9 ("In the August 23, 2021 revision, FDA clarified that, subsequent to the FDA approval of COMIRNATY . . . this EUA would remain in place for the Pfizer-BioNTech COVID-19 Vaccine for the previously-authorized indication and uses. It also authorized COMIRNATY . . . under this EUA for certain uses that are not included in the approved biologics license application (BLA).").)

74.     All existing vials of the Pfizer-BioNTech Vaccine remain available only under the authorization of the EUA.

75.     On information and belief, the existing vials of Pfizer-BioNTech COVID-19 Vaccine in the United States number in the millions, and all of these EUA vaccine doses will be administered before any does of the fully approved COMIRNATY, meaning the fully approved COMIRNATY will not be available for administration in the United States in the near future.

76.     There are currently no available doses of COMIRNATY in the United States, and COMIRNATY is not being manufactured for production or distribution in the United States at this time.

77.     In fact, the Pfizer-BioNTech Vaccine letter states that COMIRNATY is not available in the United States: "Although COMIRNATY . . . is approved to prevent COVID-19 in individuals 16 years of age and older, there is not sufficient approved vaccine available for distribution to this population . . . ." (Ex. E at 10 n.19.)

78.     Thus, the FDA has admitted and acknowledged that COMIRNATY is not available for the population in the United States, and thus extended the EUA for the Pfizer-BioNTech Vaccine.

79.     Indeed, in order for the FDA to have extended the EUA for the Pfizer-BioNTech Vaccine, it was required to find that there were no alternatives available for the Pfizer-BioNTech Vaccine. (Ex. E at 10 ("There is no adequate, approved, and **available alternative** to the Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19.").)

80.     The Federal Food, Drug, And Cosmetic Act provides that

> **subject to the provisions of this section**, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use."

21 U.S.C. § 360bbb-3(a)(1) (emphasis added) [hereinafter EUA Statute].

81.     As an essential part of the explicit statutory conditions for EUA, the EUA Statute mandates that all individuals to whom the EUA product may be administered be given the option to accept or refuse administration of the product:

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

. . . .

(ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I)–(III) (emphasis added).

82.   The statutorily required Fact Sheets for each of the EUA COVID-19 vaccines acknowledge that individuals cannot be compelled to accept or receive the vaccine. *See, e.g.*, Pfizer-BioNTech, *Vaccine Information Fact Sheet for Recipients and Caregivers* (Jan. 31, 2022), https://www.fda.gov/media/153716/download ("**Under the EUA, it is your choice to receive or not receive the vaccine. Should you decide not to receive it, it will not change your standard medical care.**" (emphasis added)).

83.   Because all COVID-19 vaccines available in the United States are subject to the EUA Statute restrictions and limitations, all individuals—including civilian

federal employees and contractors—have the explicit right under the EUA Statute to accept or refuse administration of the products.

**F.    IRREPARABLE HARM TO PLAINTIFFS.**

84.    Because of Defendants' refusal to grant Plaintiffs merited religious exemptions from the Federal COVID-19 Vaccine Mandate, Plaintiffs face the unconscionable choice of violating their sincerely held religious beliefs or being terminated from their employment.

85.    As a result of the Federal COVID-19 Vaccine Mandate, Plaintiffs have suffered and are suffering irreparable injury by being prohibited from engaging in their constitutionally and statutorily protected rights to the free exercise of their sincerely held religious beliefs.

86.    As a result of the Federal COVID-19 Vaccine Mandate, Plaintiffs have suffered and are suffering irreparable injury by being forced to choose between maintaining the ability to feed their families and the free exercise of their sincerely held religious beliefs.

87.    As a result of the Federal COVID-19 Vaccine Mandate, Plaintiffs have suffered and are suffering irreparable injury by being stripped of their rights to equal protection of the law and being subjected to disfavored class status as civilian federal employees.

88.    Plaintiffs also face the prospect of irreparable medical injury as a result of the Federal COVID-19 Vaccine Mandate. A recent study conducted by the

Department of Defense found "**higher than expected rates of heart inflammation following receipt of COVID-19 vaccines**" among military servicemembers. *See* Patricia Kime, *DoD Confirms: Rare Heart Inflammation Cases Linked to COVID-19 Vaccines*, Military.com (June 30, 2021), https://www.military.com/daily-news/2021/06/30/dod-confirms-rare-heart-inflammation-cases-linked-covid-19-vaccines.html (emphasis added).

> In fact, on or about June 29, 2021, Defendants knew that the mRNA vaccines would causing myocarditis/pericarditis (a potentially serious and deadly heart inflammation) in certain members of the military, particularly in males 30 and under. In a study conducted by United States Army, Navy, and Air Force physicians specifically found: A total of 23 male patients (22 currently serving in the military and 1 retiree; median [range] age, 25 [20-51] years) **presented with acute onset of marked chest pain within 4 days after receipt of an mRNA COVID-19 vaccine. All military members were previously healthy with a high level of fitness**. Seven received the BNT162b2-mRNA vaccine and 16 received the mRNA-1273 vaccine. A total of 20 patients had symptom onset following the second dose of an appropriately spaced 2-dose series. All patients had significantly elevated cardiac troponin levels. Among 8 patients who underwent cardiac magnetic resonance imaging within the acute phase of illness, all had findings consistent with the clinical diagnosis of myocarditis. . . . **While the observed number of myocarditis cases was small, the number was higher than expected among male military members after a second vaccine dose**.

Jay Montgomery, et al., *Myocarditis Following Immunization With mRNA COVID-19 Vaccines in Members of the US Military*, Journal of American Medical Association Network (June 29, 2021), *available at* https://jamanetwork.com/journals/jamacardiology/fullarticle/2781601 (emphasis added).

89.    Dr. Matthew Oster, a member of the President's COVID-19 Task Force, confirmed the link between the COVID-19 vaccines and myocarditis, stating: "It does

appear that mRNA vaccines may be a new trigger for myocarditis yet it does have some different characteristics." Jackie Salo, *COVID-19 mRNA vaccines likely linked to rare heart condition in kids: CDC panel*, (June 23, 2021), https://nypost.com/2021/06/23/covid-19-vaccines-from-pfizer-moderna-likely-linked-to-rare-heart-condition-cdc-panel/.

90.     Indeed, it is now well confirmed by the CDC and other studies that males 30 and under have an unacceptable risk of developing myocarditis as a result of the COVID-19 vaccines. *See* **EXHIBIT F,** Declaration of Dr. Peter McCullough.

91.     The COVID-19 genetic vaccines (Pfizer, Moderna, J&J) skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity. In other words, it is unknown whether or not these products will change human genetic material, cause birth defects, reduce fertility, or cause cancer. (Ex. F, McCullough Decl., ¶ 16.)

92.     The Pfizer, Moderna, and JNJ vaccines are considered "genetic vaccines", or vaccines produced from gene therapy molecular platforms which according to US FDA regulatory guidance are classified as gene delivery therapies and should be under a 15-year regulatory cycle with annual visits for safety evaluation by the research sponsors. FDA. Food and Drug Administration. (Ex. F, McCullough Decl., ¶ 17.)

93.     The FDA has "advised sponsors to observe subjects for delayed adverse events for as long as 15 years following exposure to the investigational gene therapy product, specifying that the long-term follow-up observation should include a

minimum of five years of annual examinations, followed by ten years of annual queries of study subjects, either in person or by questionnaire." (emphasis added) Thus, the administration of the Moderna, Pfizer, and JNJ vaccines should not be undertaken without the proper consent and arrangements for long-term follow-up which are currently not offered in the US. (See, EUA briefing documents for commitments as to follow up: Moderna , Pfizer , J&J ). They have a dangerous mechanism of action in that they all cause the body to make an uncontrolled quantity of the pathogenic wild-type spike protein from the SARS-CoV-2 virus for at least two weeks probably a longer period based on the late emergence of vaccine injury reports. This is unlike all other vaccines where there is a set amount of antigen or live-attenuated virus. This means for Pfizer, Moderna, and J&J vaccines it is not predictable among patients who will produce more or less of the spike protein. The Pfizer, Moderna, and JNJ vaccines because they are different, are expected to produce different libraries of limited antibodies to the now extinct wild-type spike protein. We know the spike protein produced by the vaccines is obsolete because the 17th UK Technical Report on SARS-CoV-2 Variants issued June 25, 2021, and the CDC June 19, 2021, Variant Report both indicate the SARS-CoV-2 wild type virus to which all the vaccines were developed is now extinct. (Ex. F, McCullough Decl., ¶ 18.)

94.     The spike protein itself has been demonstrated to injure vital organs such as the brain, heart, lungs, as well as damage blood vessels and directly cause blood clots. Additionally, because these vaccines infect cells within these organs, the

generation of spike protein within heart and brain cells, in particular, causes the body's own immune system to attach to these organs. This is abundantly apparent with the burgeoning number of cases of myocarditis or heart inflammation among individuals below age 30 years. (Ex. F, McCullough Decl., ¶ 18.)

95.     Because the US FDA and CDC have offered no interpretation of overall safety of the COVID-19 vaccines according to the manufacturer or as a group, nor have they offered methods of risk mitigation for these serious adverse effects which can lead to permanent disability or death, no one should be pressured, coerced, receive the threat or reprisal, or be mandated to receive one of these investigational products against their will. Because the vaccine centers, CDC, FDA, and the vaccine manufacturers ask for the vaccine recipient to grant indemnification on the consent form before injection, all injuries incurred by the person are at their own cost which can be prohibitive depending on the needed procedures, hospitalizations, rehabilitation, and medications. (Ex. F, McCullough Decl., ¶ 18.)

96.     The COVID-19 public vaccination program operated by the CDC and the FDA is a clinical investigation and under no circumstance can any person receive pressure, coercion, or threat of reprisal on their free choice of participation. Violation of this principle of autonomy by any entity constitutes reckless endangerment with a reasonable expectation of causing personal injury resulting in damages. (Ex. F, McCullough Decl., ¶ 21.)

97.     The total safety reports in VAERS for all vaccines per year up to 2019 was 16,320. The total safety reports in VAERS for COVID-19 Vaccines alone through October 1, 2021, is 778,683. Based on VAERS as of October 1, 2021, there were 16,310 COVID-19 vaccine deaths reported and 75,605 hospitalizations reported for the COVID-19 vaccines (Pfizer, Moderna, JNJ). By comparison, from 1999, until December 31, 2019, VAERS received 3167 death reports (158 per year) adult death reports for all vaccines combined. Thus, the COVID-19 mass vaccination is associated with at least a 39-fold increase in annualized vaccine deaths reported to VAERS. (Ex. F, McCullough Decl., ¶ 28.)

98.     COVID-19 vaccine adverse events account for 98% of all vaccine-related AEs from December 2020 through the present in VAERS. (Ex. F, McCullough Decl., ¶ 29.)

99.     The COVID-19 vaccines are not safe for general use and cannot be deployed indiscriminately or supported, recommended, or mandated among any group. (Ex. F, McCullough Decl., ¶ 30.)

100.    There are emerging trends showing that the vaccine is especially risky for those 12- 29 in Dr. McCullough's expert medical opinion with complications in the cardiovascular, neurological, hematologic, and immune systems. (See, Rose J, et al). Increasingly the medical community is acknowledging the possible risks and side effects including myocarditis, Bell's Palsy, Pulmonary Embolus, Pulmonary Immunopathology, and severe allergic reaction causing anaphylactic shock. See

33

Chien-Te Tseng, Elena Sbrana, Naoko Iwata- Yoshikawa, Patrick C Newman, Tania Garron, Robert L Atmar, Clarence J Peters, Robert B Couch, Immunization with SARS coronavirus vaccines leads to pulmonary immunopathology on challenge with the SARS virus, https://pubmed.ncbi.nlm.nih.gov/22536382/ (last visited June 21, 2021); Centers for Disease Control and Prevention, Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine—United States, December 14– 23, 2020 (Jan 15, 2021). (Ex. F, McCullough Decl., ¶ 31.)

101.   The Centers for Disease Control has held emergency meetings on this issue and the medical community is responding to the crisis. It is known that myocarditis causes injury to heart muscle cells and may result in permanent heart damage resulting in heart failure, arrhythmias, and cardiac death. These conditions could call for a lifetime need for multiple medications, implantable cardio defibrillators, and heart transplantation. Heart failure has a five-year 50% survival and would markedly reduce the lifespan of a child or young adult who develops this complication after vaccine-induced myocarditis. (Ex. F, McCullough Decl., ¶ 32.)

102.   COVID-19 vaccine-induced myocarditis has a predilection for young males below age 30 years. The Centers for Disease Control has held emergency meetings on this issue and the medical community is responding to the crisis and the US FDA has issued a warning on the Pfizer and Moderna vaccines for myocarditis. In the cases reviewed by the CDC and FDA, 90% of children with COVID-19 induced

myocarditis developed symptoms and clinical findings sufficiently severe to warrant hospitalization. Because this risk is not predictable and the early reports may represent just the tip of the iceberg, no individual under age 30 under any set of circumstances should feel obliged to take this risk with the current genetic vaccines particularly the Pfizer and Moderna products. (Ex. F, McCullough Decl., ¶ 33.)

103.    Multiple recent studies and news reports detail people 18-29 dying from myocarditis after receiving the COVID-19 vaccine. According to the CDC, 475 cases of pericarditis and myocarditis have been identified in vaccinated citizens aged 30 and younger. See FDA, Vaccines and Related Biological Products Advisory Committee June 10, 2021, Meeting Presentation. The FDA found that people 12-24 account for 8.8% of the vaccines administrated, but 52% of the cases of myocarditis and pericarditis were reported. (Ex. F, McCullough Decl., ¶¶ 34–35.)

104.    The CDC recently released data stating that there have been 267 cases of myocarditis or pericarditis reported after receiving one dose of the COVID-19 vaccines and 827 reported cases after two doses through June 11. There are 132 additional cases where the number of doses received is unknown. Id. There have been 2,466 reported cases of myocarditis that have occurred, and the median age is thirty. (Ex. F, McCullough Decl., ¶ 37.) And, the CDC just announced that the vaccine is "likely linked" to myocarditis. Advisory Board, CDC panel reports 'likely association' of heart inflammation and mRNA COVID-19 vaccines in young people. (Ex. F, McCullough Decl., ¶ 36.)

105.   The irreparable harm to Plaintiffs and the class members they represent is incalculable, unconscionable, and unconstitutional.

## CLASS ALLEGATIONS

106.   Plaintiffs satisfy the requirements Fed. R. Civ. P. 23(a) because the class is so numerous that joinder of all members is impracticable, each member's claims involve common questions of law and fact, the claims of the representatives are typical of and identical to the claims of the other members of the class, and the representatives here will fairly and adequately protect the interests of the class in having the primarily legal questions addressed by the Court in an expeditious manner. The federal government directly employs approximately 2.1 million individuals.

107.   Plaintiffs have typicality with the other members of the class of civilian federal employees who have been denied religious exemption from the Federal COVID-19 Vaccine Mandate, estimated to number in the thousands or even tens of thousands, and who are threatened with the unconscionable choice between conformance with their sincerely held religious convictions and adverse employment action.

108.   Plaintiffs have commonality with the other members of the class because they are all civilian federal employees subject to the Federal COVID-19 Vaccine Mandate.

109.   Plaintiffs' claims in the Court are representative of the claims of other class members and involve questions of fact and law that are common to all class members, including, *inter alia*,

(a) whether the EUA Statute requires that Plaintiffs be given the option to refuse a COVID-19 vaccine because there is currently no FDA approved COVID-19 vaccine available;

(b) whether Defendants violate the First Amendment to the United States Constitution by mandating that Plaintiffs accept and receive a COVID-19 vaccine regardless of whether Plaintiffs' and the other class members' sincerely held religious beliefs compel them to abstain from acceptance or receipt of the three currently available COVID-19 vaccines; and

(c) whether the federal Religious Freedom Restoration Act (RFRA) requires Defendants and all those in active concert with them to provide accommodations and exemptions to those Plaintiffs with sincerely held religious convictions that compel them to abstain from receiving one of the three currently available COVID-19 vaccines.

110.   Plaintiffs' claims are representative and common among all class members because the injury sustained—Defendants' refusals to grant exemption and accommodation for sincerely held religious objections to the COVID-19 vaccines and the resulting adverse employment actions—are categorically identical. Indeed,

Plaintiffs and the other members of the class "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

111.   Plaintiffs will fairly and adequately protect the interests of the class because they are seeking a temporary restraining order, preliminary and permanent injunctive relief, and declaratory relief against enforcement of the Federal COVID-19 Vaccine Mandate and Defendants' refusals to entertain or grant religious exemptions and accommodations which will provide relief to all class members.

112.   Plaintiffs likewise satisfy the requirements of Fed. R. Civ. P. 23(b) because Defendants have acted in a manner that applies to all members of the class with respect to the Federal COVID-19 Vaccine Mandate, and have refused to grant religious accommodations to the entire group of class members who have sincerely held religious objections to receiving a COVID-19 vaccine under the Mandate. Fed. R. Civ. P. 23(b)(2).

113.   Additionally, Plaintiffs' requested injunctive and declaratory relief would appropriately protect of the entire class as a whole. Fed. R. Civ. P. 23(b)(2).

114.   Moreover, Plaintiffs satisfy the requirements of Fed. R. Civ. P. 23(b) because the common questions of law and fact applicable to the class members' claims predominate over individualized questions pertaining to individual class members. Fed. R. Civ. P. 23(b)(3).

115.   Plaintiffs and the other class members' claims are more fairly and efficiently adjudicated by a class action, as the claims for religious accommodation

and exemption from the Federal COVID-19 Vaccine Mandate are virtually identical among all class members, the relevant facts applicable to each individual class member are substantially similar, and the applicable substantive law for the class members' claims is identical in all respects. Fed. R. Civ. P. 23(b)(3).

**COUNT I**
**VIOLATION OF THE EMERGENCY USE AUTHORIZATION PROVISIONS**
**OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT,**
**21 U.S.C. § 360bbb-3**

116.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–115 as if fully set forth herein.

117.   The Federal Food, Drug, And Cosmetic Act provides that

> **subject to the provisions of this section**, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use."

21 U.S.C. § 360bbb-3(a)(1) (emphasis added).

118.   For ease of reference, Plaintiffs will refer to the general provisions of 21 U.S.C. §360bbb-3 as the "Emergency Use Authorization Statute" or "EUA Statute."

119.   The Emergency Use Authorization Statute further provides the limitations on when the Secretary may authorize the emergency use of an unapproved product for use in interstate commerce, and specifically limits such authorization to circumstances where the Secretary of Homeland Security has determined certain emergencies exits, where the Secretary of Defense has determined that certain military

emergencies exist, where the Secretary of the Department of Health and Human services has determined that certain public health emergencies exist, and where there has been some identification of a material threat pursuant to other provisions of the United States Code. *See* 21 U.S.C. § 360bbb-3(b)(1)(A)-(D).

120.   The Secretary's Emergency Use Authorization terminates whenever the circumstances described in 21 U.S.C. § 360bbb-3(b)(1)(A)-(D) cease to exist or where the product approved for Emergency Use under the statute receives a change in approval status. 21 U.S.C. § 360bbb-3(b)(2)(A)(i)-(ii).

121.   As an essential part of the explicit statutory conditions for EUA, the EUA Statute mandates that all individuals to whom the EUA product may be administered be given the option to accept or refuse administration of the product:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:
>
> . . . .
>
> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> (I) that the Secretary has authorized the emergency use of the product;
>
> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I)–(III) (emphasis added).

122.    Consistent with the requirement in the Emergency Use Authorization statute that all potential recipients of the COVID-19 vaccine be informed of the option to accept or refuse the vaccine, the Emergency Use Authorization Fact Sheet for all three of the currently available COVID-19 vaccines specifically states—as required by the Emergency Use Authorization Statute—that individuals have the right to refuse administration of the COVID-19 vaccine. *See* Moderna, *Vaccine Information Fact Sheet for Recipients and Caregivers* (Jan. 31, 2022), https://www.fda.gov/media/144638/download ("**Under the EUA, it is your choice to receive or not receive the vaccine. Should you decide not to receive it, it will not change your standard medical care.**" (emphasis added)); Pfizer-BioNTech, *Vaccine Information Fact Sheet for Recipients and Caregivers* (Jan. 31, 2022), https://www.fda.gov/media/153716/download ("**Under the EUA, it is your choice to receive or not receive the vaccine. Should you decide not to receive it, it will not change your standard medical care.**" (emphasis added)); Janssen, *Fact Sheet for Recipients and Caregivers* (Jan. 31, 2022), https://www.fda.gov/media/146305/download ("**It is your choice to receive or not receive the Janssen COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.**" (emphasis added)).

123.   The Emergency Use Authorization Statute provides that, **as** a condition of receiving authorization for emergency use, ALL individuals to whom the EUA product may be administered are given the right to accept or refuse administration of the product. The EUA right to accept or refuse applies and cannot be waived for civilian federal employees.

124.   The only currently available COVID-19 vaccines (Janssen/Johnson & Johnson, Moderna, and Pfizer/BioNTech) are only authorized for use under the Emergency Use Authorization statute and have no general approval under the United States Code.

125.   Because all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization statute, the Emergency Use Authorization statute mandates that all individuals to whom the product may be administered, including Plaintiffs, be given the right to accept or refuse administration of the product.

126.   Because all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization statute, the Emergency Use Authorization statute prohibits Defendants from making the COVID-19 vaccines mandatory.

127.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiffs' sincerely held religious beliefs.

128.   Plaintiffs have no adequate remedy at law for the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT II
## VIOLATION OF THE FIRST AMENDMENT
## TO THE UNITED STATES CONSTITUTION

129.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–115 above as if fully set forth herein.

130.   The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government from abridging Plaintiffs' rights to free exercise of religion.

131.   Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

132.   Plaintiffs have and exercise sincerely held religious beliefs (articulated in Section B, *supra*) which compel them to abstain from receiving or accepting any of the currently available COVID-19 vaccines.

133.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, targets Plaintiffs' sincerely held religious beliefs by prohibiting Plaintiffs from seeking and receiving exemption and accommodation for their sincerely held religious beliefs against the COVID-19 vaccines.

134.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs, compels Plaintiffs to either change those beliefs or act in contradiction to them, and forces Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the government's imposed value system.

135.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, places Plaintiffs in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs.

136.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, puts substantial pressure on Plaintiffs to violate their sincerely held religious beliefs or face loss of their ability to feed their families.

137.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, is neither neutral nor generally applicable.

138.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, specifically targets Plaintiffs' religious beliefs for disparate and discriminatory treatment.

139.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, creates a system of individualized exemptions for preferred exemption requests while discriminating against requests for exemption and accommodation based on sincerely held religious beliefs. Although all civilian federal employees are ostensibly bound by the Vaccine Mandate, Congress, the Internal Revenue Service (IRS), and the United

States Postal Service are exempt. Indeed, a certain husband and wife are both federal employees. One works for the IRS while the other works for the Veterans Administration (VA). Although husband and wife are working as federal employees, one is under the Vaccine Mandate, and one is not.

140.    The Federal COVID-19 Vaccine Mandate, on its face and as applied, constitutes a religious gerrymander by unconstitutionally orphaning exemption and accommodation requests based solely on sincerely held religious beliefs of Plaintiffs while permitting the more favored medical exemptions to be granted.

141.    The Federal COVID-19 Vaccine Mandate, on its face and as applied, constitutes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs.

142.    The Federal COVID-19 Vaccine Mandate, on its face and as applied, fails to accommodate Plaintiffs' sincerely held religious beliefs.

143.    There is no legitimate, rational, or compelling interest in the Federal COVID-19 Vaccine Mandate's exclusion of exemptions and accommodations for sincerely held religious beliefs.

144.    The Federal COVID-19 Vaccine Mandate is not the least restrictive means of achieving an otherwise permissible government interest.

145.    The Federal COVID-19 Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiffs' sincerely held religious beliefs.

146.   Plaintiffs have no adequate remedy at law to protect the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT III
## VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT, 42 U.S.C. §§ 2000bb to 2000bb-4

147.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–115 above as if fully set forth herein.

148.   The Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

149.   RFRA also demands that, should the government substantially burden a person's free exercise of religion, it bears the burden of demonstrating that its burden on religious exercise furthers a compelling government interest and is the least restrictive means of achieving that compelling government interest. 42 U.S.C. § 2000bb-1(b).

150.   RFRA plainly applies to Defendants, as each represents a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1).

151.   Congress enacted RFRA "to provide **very broad** protection for religious liberty," going "far beyond what [the Supreme Court] has held is constitutionally required" under the First Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693, 706 (2014) (emphasis added).

152.   As such, RFRA encompasses a very broad definition of "exercise of religion," which includes "'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Hobby Lobby*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000bb—5(7)(A)).

153.   RFRA mandated that the law "'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Hobby Lobby*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000cc—3(g)).

154.   "RFRA operates as a kind of super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020).

155.   Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

156.   Plaintiffs have and exercise sincerely held religious beliefs (articulated *supra* Section B) which compel them to abstain from receiving or accepting any of the currently available COVID-19 vaccines.

157.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, targets Plaintiffs' sincerely held religious beliefs by prohibiting Plaintiffs from seeking and receiving exemption and accommodation for their sincerely held religious beliefs against the COVID-19 vaccines.

158.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs, compels Plaintiffs to either change those beliefs or act in contradiction to them, and forces Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the government's imposed value system.

159.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, places Plaintiffs in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs.

160.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, puts substantial pressure on Plaintiffs to violate their sincerely held religious beliefs or face loss of their ability to feed their families.

161.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, specifically targets Plaintiffs' religious beliefs for disparate and discriminatory treatment.

162.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, creates a system of individualized exemptions for preferred exemption requests while

discriminating against requests for exemption and accommodation based on sincerely held religious beliefs.

163.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, constitutes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs.

164.   By forcing Plaintiffs into the unconscionable choice between violating their sincerely held religious convictions and facing termination and other disciplinary measures, Defendants' mandate constitutes a substantial burden on Plaintiffs' exercise of religion.

165.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, fails to accommodate Plaintiffs' sincerely held religious beliefs.

166.   There is no legitimate, rational, or compelling interest in the Federal COVID-19 Vaccine Mandate's exclusion of exemptions and accommodations for sincerely held religious beliefs.

167.   The Federal COVID-19 Vaccine Mandate is not the least restrictive means of achieving an otherwise permissible government interest.

168.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiffs' sincerely held religious beliefs.

169.   Plaintiffs have no adequate remedy at law for the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT IV
## ULTRA VIRES ACTS

170.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–115 above as if fully set forth herein.

171.   A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996). "Even if the [agency head] were acting at the behest of the President, this does not leave the courts without power to review the legality of the action, for courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (cleaned up).

172.   The Federal COVID-19 Vaccine Mandate, as purportedly applied to civilian federal employees by Executive Order 14043, is ultra vires. Neither the President, any Defendant, nor any other executive official has constitutional or statutory authority to require every civilian federal employee and contractor to get vaccinated.

173.   Under the "major questions doctrine," Congress must "speak[] clearly when it delegates the power to make decisions of vast economic and political significance." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1925 (2020) (Thomas, J., concurring in part); *see Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an

agency to exercise powers of 'vast economic and political significance.'"); *King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). There is no doubt that the challenged acts are ones of "vast economic and political significance," given the sheer numbers of employees involved.

174.   The Vaccine Mandate also targets an area traditionally occupied by the States—vaccinations and general health.

175.   Any one of these grounds would require Congress to provide clear authorization to the President to issue the Vaccine Mandate.

176.   None of the statutory authorities relied on in issuing the Vaccine Mandate (including Executive Order 14043) or any other possibly relevant document or action here provides that Congress handed over the power to do something as drastic as vaccinate every federal employee and contractor, on pain of termination of employment and contracts. *See, e.g.*, 5 U.S.C. §§ 3301, 3302, 7301. These statutes refer to selecting civil service applicants and regulating federal employees' "conduct"—subjects far afield from requiring vaccination (which indeed is not employee "conduct" at all, but rather a "status").

177.   Even Congress, itself, does not have the authority under the Constitution to issue a COVID-19 vaccine mandate on all civilian federal employees or contractors.

178.   At best, Congress would have to rely on the Commerce Clause to issue such a mandate itself, but Congress's authority to impose a COVID-19 vaccine mandate under the Commerce Clause is utterly lacking because "a person's choice to

remain unvaccinated and forego regular testing is noneconomic activity," and "while the Commerce Clause power may be expansive . . . it does not grant Congress the power to regulate noneconomic inactivity traditionally within the States' police power." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021).

179.   Plaintiffs have no adequate remedy at law for the ongoing and irreparable harm imposed by the ultra vires Federal COVID-19 Vaccine Mandate.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT V
## VIOLATION OF THE APA, 5 U.S.C. § 706(2)(C),
## BY ACTING IN EXCESS OF STATUTORY JURISDICTION

180.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–115 and 171–178 above as if fully set forth herein.

181.   Under the Administrative Procedure Act, 5 U.S.C. § 706, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

182.   The Federal COVID-19 Vaccine Mandate is unlawful, not in accordance with law, and in excess of Defendants' authority because they have no constitutional or statutory authority to issue such a mandate.

183.   The Federal COVID-19 Vaccine Mandate is unlawful, not in accordance with law, and in excess of Defendants' authority because it represents an unlawful

attempt by the President to delegate authority to issue regulations when he possesses no authority to issue such regulations himself.

184.   The Federal COVID-19 Vaccine Mandate is unlawful, not in accordance with law, and in excess of Defendants' authority because it was issued at the direction of the President, not Congress, and "invokes the outer limits of Congress' power." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).

185.   The Court must "expect a clear indication that Congress intended" the OMB to possess such authority, *id.*, but no such clear indication of Congressional intent has been given, and no such indication could have been given because Congress lacks the authority to impose a mandate itself, much less delegate to an executive agency the authority to impose such a mandate.

186.   Congress did not give Defendants, and the President does not otherwise possess—by Constitution, statute, or otherwise—any legal authority to impose a COVID-19 vaccine mandate on all civilian federal employees or all persons contracting with the federal government.

187.   And because Congress lacks the authority under the Constitution to do so, it could not have delegated to or otherwise given Defendants the authority to impose a COVID-19 vaccine mandate on all civilian federal employees or contractors.

188.   Plaintiffs have no adequate remedy at law for the ongoing and irreparable harm imposed by the Federal COVID-19 Vaccine Mandate issued in violation of the APA and in gross excess of any legally authorized power.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT VI
## VIOLATION OF THE APA, 5 U.S.C. § 706(2)(B),
## BY ACTING CONTRARY TO CONSTITUTIONAL RIGHT

189.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–115 and 130–145 above as if fully set forth herein.

190.   Under the Administrative Procedure Act, 5 U.S.C. § 706, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

191.   In addition to being in excess of the legal authority delegated to Defendants, the Federal COVID-19 Vaccine Mandate is unlawful under the APA because it is contrary to a constitutional right, power, privilege, or immunity.

192.   The Federal COVID-19 Vaccine Mandate and the corresponding refusals to review, consider, or grant religious exemptions and accommodations from the mandate are neither neutral nor generally applicable, and are contrary to the First Amendment of the United States Constitution.

193.   Plaintiffs have no adequate remedy at law for the ongoing and irreparable harm imposed by Defendants' COVID-19 Vaccine Mandate issued in violation of the APA and in violation of Plaintiffs' constitutional rights.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT VII
## VIOLATION OF THE APA, 5 U.S.C. § 706(2)(A), BY IMPOSING ARBITRARY AND CAPRICIOUS RULE

194.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–115 above as if fully set forth herein.

195.   Under the Administrative Procedure Act, 5 U.S.C. § 706, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

196.   An agency action is arbitrary and capricious where—as here—it fails to "examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

197.   "If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable."

*SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action." *Id.* at 196–97.

198. The Court also cannot "be expected to chisel that which must be precise from what the agency has left vague and indecisive." *Id.* at 197.

199. "The agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

200. "The reviewing court should not attempt itself to make up for such deficiencies: [It] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vechicle Mfrs. Ass'n*, 463 U.S. at 43 (cleaned up).

201. The Federal COVID-19 Vaccine Mandate is arbitrary and capricious under the APA because it fails to reflect the required reasoned decisionmaking.

202. The Federal COVID-19 Vaccine Mandate—issued at the direction of the President—contains no sufficient reasons or rationale.

203. The Federal COVID-19 Vaccine Mandate contains no examination of the relevant data or any connection of that data to the stated rationale.

204. The Federal COVID-19 Vaccine Mandate is not supported by compelling or substantial evidence.

205. The Federal COVID-19 Vaccine Mandate makes no supported findings, fails to provide evidence for its findings, and impermissibly relies upon the Court to chisel precision out of its arbitrary and capricious—indeed, unstated—rationale.

206.    Plaintiffs have no adequate remedy at law for the ongoing and irreparable harm imposed by the Federal COVID-19 Vaccine Mandate issued in violation of the APA and in an arbitrary and capricious manner.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray for relief as follows:

A.    That the Court issue a temporary restraining order restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Federal COVID-19 Vaccine Mandate such that:

i.    Defendants will immediately comply with the Emergency Use Authorization Statute so that each individual has the "option to accept or refuse" administration of the COVID-19 vaccines as there is currently no FDA approved COVID-19 vaccine available to the population;

ii.    Defendants will immediately cease in their refusal to consider, evaluate, or accept Plaintiffs' requests for exemption and accommodation for their sincerely held religious beliefs;

    iii.    Defendants' will immediately grant Plaintiffs' requests for religious exemption and accommodation from the Federal COVID-19 Vaccine Mandate; and

    iv.    Defendants will immediately cease any actions arising from or connected to Plaintiffs' religious exemption and accommodation requests, including demotion, termination, or other disciplinary actions for failure to accept a COVID-19 vaccine that violates their sincerely held religious beliefs;

B.    That the Court issue a preliminary injunction pending trial, and a permanent injunction upon judgment, restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Federal COVID-19 Vaccine Mandate such that:

    i.    Defendants will immediately comply with the Emergency Use Authorization Statute so that each individual has the "option to accept or refuse" administration of the COVID-19 vaccines as there is currently no FDA approved COVID-19 vaccine available to the population;

     ii.    Defendants will immediately cease in their refusal to consider, evaluate, or accept Plaintiffs' requests for exemption and accommodation for their sincerely held religious beliefs;

     iii.    Defendants' will immediately grant Plaintiffs' requests for religious exemption and accommodation from the Federal COVID-19 Vaccine Mandate; and

     iv.    Defendants will immediately cease any actions arising from or connected to Plaintiffs' religious exemption and accommodation requests, including demotion, termination, or other disciplinary actions for failure to accept a COVID-19 vaccine that violates their sincerely held religious beliefs;

C.    That the Court render a declaratory judgment declaring that the Federal COVID-19 Vaccine Mandate, both on its face and as applied by Defendants, is illegal and unlawful in that it purports to remove federal civil rights and constitutional protections from civilian federal employees, and further declaring—

     i.    the Federal COVID-19 Vaccine Mandate violates the federal Emergency Use Authorization provisions of the Federal Food, Drug, and Cosmetic Act by imposing a mandatory COVID-19 shot upon Plaintiffs without giving the "option to accept or refuse" the EUA product;

ii.    the Federal COVID-19 Vaccine Mandate, without sufficient provision for exemption or accommodation for sincerely held religious beliefs, violates the First Amendment to the United States Constitution by imposing a substantial burden on Plaintiffs' sincerely held religious beliefs;

iii.   the Federal COVID-19 Vaccine Mandate, without sufficient provision for exemption or accommodation for sincerely held religious beliefs, violates the federal Religious Freedom Restoration Act by imposing a substantial burden on Plaintiffs' sincerely held religious beliefs;

iv.    the Federal COVID-19 Vaccine Mandate is ultra vires because it exceeds any constitutional or statutory power of the President or any Defendant;

v.     the Federal COVID-19 Vaccine Mandate is unlawful under the Administrative Procedure Act because it was issued in excess of statutory jurisdiction, is contrary to a constitutional right, privilege, or immunity, and is arbitrary and capricious.

D.    That the Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

E.     That the Court award Plaintiffs actual damages in an amount to be determined at trial;

F.     That the Court award Plaintiffs their reasonable attorney's fees, costs, and other expenses and disbursements in this action under 28 U.S.C. §§ 1920 and 2412 and 42 U.S.C. § 1988, and as otherwise allowed by law.

G.     That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order; and

H.     That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

/s/ Roger K. Gannam
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid*
Richard L. Mast*
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org*
rmast@lc.org*
*Specially admitted
*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this February 21, 2022, I caused a true and correct copy of the foregoing to be electronically filed with the Court. Service will be effectuated on all counsel of record via the Court's ECF/electronic notification system.

<u>/s/ Roger K. Gannam</u>
Roger K. Gannam

**VERIFICATION**

I, STATE DEPARTMENT EMPLOYEE 1, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this SECOND AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated: February 7, 2022

/s/ STATE DEPARTMENT EMPLOYEE 1
STATE DEPARTMENT EMPLOYEE 1
(Original Signature retained by Counsel)

## **VERIFICATION**

I, MANAGEMENT AND PROGRAM ANALYST, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this SECOND AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated: February 7, 2022

/s/ MANAGEMENT AND PROGRAM ANALYST
MANAGEMENT AND PROGRAM ANALYST
(Original Signature retained by Counsel)